**\* NOT FOR PUBLICATION \***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                    :
RONALD STANDOWSKI,                  :
                                    :
            Plaintiff,              :
                                    :
      v.                            :        Civ. Action No.: 13-05663 (FLW)
                                    :               OPINION
CAROLYN C. COLVIN,                  :
ACTING COMMISSIONER OF SOCIAL       :
SECURITY                            :
                                    :
                                    :
            Defendant.              :
_____:

**WOLFSON, United States District Judge:**

Ronald Standowski ("Plaintiff") appeals from the final decision of the Acting Commissioner of Social Security ("Defendant") denying Plaintiff disability benefits under Title II of the Social Security Act ("SSA"). Plaintiff contends that the record does not support the decision made by the Administrative Law Judge ("ALJ"). Specifically, Plaintiff argues that the ALJ failed to properly evaluate certain objective and subjective medical evidence. After reviewing the Administrative Record, this Court finds it would be appropriate to remand this matter because the ALJ's Step Four residual functional capacity determination did not provide this Court with a clear and satisfactory explication of Plaintiff's severe impairments. Accordingly, this case is remanded for further proceedings before the Administrative Law Judge consistent with this Opinion.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff was born on September 24, 1956, and he was 52 years old on the alleged disability onset date of January 1, 2009. A.R. 97-98. He has a high school education. Id. at 116. Prior to his disability date, Plaintiff worked at MetLife for approximately four years. Id. However, Plaintiff was laid off in December of 2008. Id. At MetLife, Plaintiff testified, "I was in a back office, in [the] broker dealer office." Id. at 38. He described his position as processing claims, which he admitted was "sedentary work." Id. at 38. Before MetLife, Plaintiff worked at Prudential for approximately eight years. Id. at 39. At Prudential, Plaintiff testified that he worked in the mailroom, and he also was a switchboard operator. Id. According to Plaintiff, he suffers from obesity, back pain, asthma, chronic obstructive pulmonary disease ("COPD"), sleep apnea, chronic digestive problems, numbness in his left leg and hand, high blood pressure, glaucoma, and depression. See id. at 34-59.

Plaintiff applied for Social Security Disability Insurance Benefits ("SSDIB") on June 2, 2010, alleging disability beginning on January 1, 2009. Id. 97-98. The application was denied on January 29, 2011, and the reconsideration of the application was also denied on May 4, 2011. Id. at 77-81, 83-85. Plaintiff requested a hearing by an ALJ. Id. at 86-87. On January 13, 2012, Plaintiff appeared, pro se, before ALJ April M. Wexler. Id. at 32-59. On January 25, 2012, the ALJ issued a decision finding that Plaintiff was not disabled. Id. at 20-26. Plaintiff requested review by the Appeals Council. Id. at 15-16. However, the Appeals Council denied Plaintiff's requested review on July 26, 2013. Id. at 1-7. On September 23, 2013, Plaintiff filed this appeal against the Acting Commissioner of Social Security.[1]

---

[1]    In October 2013, Plaintiff filed a new application for SSDIB. Pl.'s Br. at 2. Plaintiff was approved with an onset date of January 26, 2012. Id.; see also Notice of Award at 1. He is now receiving monthly disability benefits. Id. Thus, Plaintiff's appeal is amended to

## REVIEW OF THE MEDICAL EVIDENCE

Before and after the alleged disability onset date, Plaintiff saw a number of treating physicians and medical professionals. Plaintiff also saw additional medical professionals in connection with his application for disability benefits. The relevant findings of these professionals are detailed below.

**1. Relevant Medical History**

In 2001, Plaintiff visited Dr. Francisco Del Valle ("Dr. Del Valle") because of lower back pain. A.R. 250-252. In his report, Dr. Del Valle stated that Plaintiff had suffered from episodic back pain for several years, but Plaintiff began to suffer severe back pain and radiating numbness in 2000. Id. at 250. Dr. Del Valle reported that he performed two lumbar epidural steroidal injections, which were ineffective. Id. at 248. In addition, Dr. Del Valle prescribed Neurontin and Oxycontin. Id. at 249.

On February 27, 2012, Dr. Harold McKenna ("Dr. McKenna"), Plaintiff's primary care doctor, provided a hand-written letter outlining his care and treatment of Plaintiff. Id. at 265-267. In the letter, Dr. McKenna stated, "Mr. Ronald Standowski has been under my care for multiple medical problems worsening over the past several years and he is completely disabled by these conditions highlighted below." Id. at 265. Dr. McKenna then listed the following conditions: asthma, COPD, multiple disc herniations with nerve damage, intestinal adhesions, severe sleep apnea, and severe hyperlipidemia. Id. In addition, Dr. McKenna provided the dates that he had treated Plaintiff, and he also provided a list of the medication that he had prescribed. Id. at 265-267.

---

reflect an appeal for an earlier onset of benefits for January 1, 2009 through January 26, 2012.

Records reveal that Dr. McKenna ordered an MRI of Plaintiff's back in 2006. Id. at 170. On May 26, 2006, Raritan Bay Open MRI performed a diagnostic test of Plaintiff's lumbar spine. Id. In the report, the clinical impression stated, "L4-5 Herniation. Diffuse disc bulging with posterior element spondylosis causing additional spinal stenosis at L5-S1. No evidence of cord compression." Id. On that same day, Raritan Bay Open MRI also performed a diagnostic test of Plaintiff's cervical spine. Id. at 172. In the report, the clinical impression stated, "Diffused disc bulging with marginal ostepphyte formation, uncinate process and facet hypertrophy causing spinal canal encroachment as described above. No evidence of herniation or cord compression." Id.

On July 17, 2009, Dr. Lucyna Lupicki ("Dr. Lupicki"), an orthopedic specialist, examined Plaintiff because he complained of tingling in his left hand. Id. at 173. After performing an electrodiagnostic test, Dr. Lupicki concluded that "[t]here is electrophysiologic evidence of left ulnar mononeuropathy across the elbow, manifested by segmental demyelination affecting sensory and motor fibers, without evidence of motor axonal loss." Id. at 174. Dr. Lupicki recommended that Plaintiff should avoid habitual leaning on his left elbow, he should extend his left elbow during sleep, and he should visit an orthopedic surgeon to discuss further treatment options. Id.

On August 4, 2009, Dr. Joshua Zimmerman ("Dr. Zimmerman"), and orthopedic specialist, examined Plaintiff because he complained of pain and numbness in his left small and ring finger. Id. at 182. After examination, Dr. Zimmerman found that Plaintiff had "positive Tinel of the left elbow," and he demonstrated a "mildly weak pinch." Id. Dr. Zimmerman concluded that Plaintiff had cubital tunnel syndrome, and he prescribed bracing the elbow during sleep. Id. On September, 25, 2009, Plaintiff returned to Dr.

Zimmerman for a follow up visit. Id. at 181. At the examination, Dr. Zimmerman concluded that Plaintiff did not respond to the bracing of the elbow, and thus, Dr. Zimmerman recommended surgery. Id. at 181. On October 29, 2009, Dr. Zimmerman performed a left elbow ulnar nerve release and cubital tunnel release surgery. Id. at 179. After surgery, Dr. Zimmerman reported, "The nerve was protected. The cubital tunnel was then released in its entirety with the scissor dissection with care taken at all times to protect the ulnar nerve." Id.

On November 13, 2009, Plaintiff followed up with Mr. Zimmerman. Id. at 178. At the examination, Plaintiff complained that he was still suffering from numbness; however, Dr. Zimmerman found that Plaintiff had a full range of motion, and he demonstrated "good pinch strength." Id. On December 11, 2009, Plaintiff once again visited Dr. Zimmerman complaining of numbness. Id. at 177. In his report, Dr. Zimmerman noted that Plaintiff had "excellent pinch strength and excellent grip strength. Id. Finally, Plaintiff visited Dr. Zimmerman on April 16, 2010. Id. at 176. Plaintiff complained that he never recovered from the surgery, and he still experienced numbness. Id. Dr. Zimmerman expressed alternative surgical methods to cure the situation, including an anterior transportation. Id. Plaintiff responded that he would consider the surgical option. Id.

On June 17, 2010, Raritan Bay Medical Imaging performed a diagnostic test of Plaintiff's lumbar spine at the request of Dr. McKenna. Id. at 183. In the report, the clinical impression stated, "Degenerative spondylosis L3 through S1 with Disc bulge and facet arthropathy at L3-4. Disc bulge and large central disc herniation L4-5 and diffuse disc bulge at L5-S1. No significant change. No new disc herniation is identified." Id.

On October 25, 2010, Dr. Francky Merlin ("Dr. Merlin"), an agency consultative doctor, examined Plaintiff. Id. at 200. Dr. Merlin diagnosed Plaintiff with high blood pressure, low back pain, and asthma. Id. In the report, Dr. Merlin noted that Plaintiff had a history of depression, sleep apnea, diverticulitis, hernia repair, left cubital release surgery, and an appendectomy, and that Plaintiff is a smoker" but he stopped drinking 15 years ago and denies illegal drug use." Id. at 198–99. In Dr. Merlin's opinion, Plaintiff was a well-developed, obese male that is alert, conscious, and orientated. Id. In pertinent part, Dr. Merlin reported that Plaintiff's "[s]tation and gait are normal," and he had "no difficulty getting up from a sitting position or getting on and off the examining table." Id. He wrote that Plaintiff's "grasping strength and manipulative functions are not impaired," and Plaintiff was "able to flex [his] spine forward 0-75 degrees, squat, and walk on his heels and toes." Id. However, Dr. Merlin noted that Plaintiff did experience some tenderness in the lumbar region. Id.

On January 20, 2011, Dr. Seung Park, an agency consultative doctor, reviewed Plaintiff's medical records, and she provided a physical residual functional capacity assessment.[2] Id. at 206-211. In regard to exertional limitations, Dr. Park concluded that Plaintiff could occasionally lift or carry twenty pounds, and he could frequently lift or carry ten pounds. Id. at 207. Dr. Park concluded that Plaintiff could stand or walk with normal breaks for a total of at least two hours in an eight-hour workday. Id. She also determined that Plaintiff could sit with normal breaks for a total of about six hours in an eight-hour workday. Id. In addition, Dr. Park determined that Plaintiff could push or pull with both

---

[2]     On September 25, 2010, Dr. Park had also reviewed Plaintiff's medical records. A.R. 197. However, Dr. Park determined that the medical evidence provided was insufficient to reach a conclusion. Id.

upper and lower extremities. Id. In regard to postural limitations, Dr. Park concluded that

Plaintiff could frequently climb ramps and stairs, but he could only occasionally climb a

ladder, rope, and scaffold. Id. at 208. In that connection, Dr. Park concluded that Plaintiff

could frequently kneel, crouch, and craw, but he could only occasionally stoop. Id. Finally,

Dr. Park determined that Plaintiff did not have any manipulative limitations. Id.

On January 21, 2011, Dr. Elliot Goytia, an agency consultative doctor, reviewed

Plaintiff's medical records, and he also provided a physical residual functional capacity

assessment.[3] Id. at 212. Dr. Goytia reached the same conclusions as Dr. Park in regard to

Plaintiff's exertional and postural limitations. See id. at 213-214. Dr. Goytia additionally

concluded that Plaintiff should avoid concentrated exposure to extreme cold and heat,

fumes, odor, dust, gases, poor ventilation, and hazards, such as machinery and heights. Id.

at 215. And, Dr. Goytia concluded that Plaintiff could not be exposed to unlimited wetness,

humidity, noise, and vibration. Id.

From January 2010 to January 2011, Dr. Vipul Lakhani of Lakhani Eye Associates

treated Plaintiff for complaints of worsening vision. In the medical records, Dr. Lakhani

wrote that Plaintiff suffered from "glaucoma suspect." Id. at 218. According to Plaintiff,

he was diagnosed with glaucoma in his right eye, and he was prescribed eye drops. Id. at

51.

On March 22, 2011, Raritan Bay Medical Imaging performed diagnostic test of

Plaintiff's chest at the request of Dr. McKenna. Id. at 260. In the report, the clinical

impression stated that Plaintiff had COPD. Id.

---

[3]     On May 4, 2011, Dr. A.M. Pirone, an agency consultative doctor, reviewed the
physical residual functional capacity assessments, and he reaffirmed the conclusions
reached by Dr. Park and Dr. Goytia. A.R. 255.

On February 20, 2012, Dr. Vinod Sinha ("Dr. Sinha"), Plaintiff's treating doctor, examined Plaintiff because he complained of trouble breathing. Id. at 307. In his report, Dr. Sinha noted that Plaintiff has smoked for over thirty years. Id. He also noted that Plaintiff suffers from wheezing after mild exertion. Id. Dr. Sinha concluded that Plaintiff suffered from obesity and COPD, and he recommended a smoking cessation education program. Id. On March 19, 2012, Plaintiff went back to Dr. Sinha for a follow up visit. At the examination, Dr. Sinha stated that Plaintiff "has cut down smoking to 6-10 cigarettes/day, wheezing has resolved and overall he feels better, but still complains of dyspnea on exertion." Id. at 308. On April 10, 2012, Plaintiff visited Dr. Sinha again, and Plaintiff complained of trouble breathing after exertion, but Dr. Sinha noted that Plaintiff continues to smoke one-half a pack of cigarettes a day. Id. at 309.

On April 30, 2012, Plaintiff again saw Dr. Sinha. Id. at 310. In his report, Dr. Sinha noted that Plaintiff's "[b]reathing is better. No more cough or wheezing." Id. at 310. Dr. Sinha did note that Plaintiff stated that he still suffers from shortness of breath, and he also complained of neck pain, which causes numbness and tingling in right arm when he turns his neck to the right side, and lower back pain.[4] Id.

**REVIEW OF THE TESTIMONIAL RECORD**

**1. Plaintiff's Testimony[5]**

---

[4]      In his report, Dr. Sinha wrote that Plaintiff stated that he "has filed for disability on account of LBP and Asthma and has been turned down four times. Now he is appealing it through an Attorney and wants all these tests as documentation for getting disability." A.R. 310.

[5]      At the hearing, Plaintiff appeared *pro se*. A.R. 34-36. In that connection, Plaintiff did not present a vocational expert or any witnesses.

At the hearing before the ALJ, Plaintiff testified that he filed for SSDIB after he was laid off from his employment at MetLife in December of 2008. Id. at 37-38. He explained, "I was basically disabled a few years before that." Id. at 37-38. However, he further explained, "My doctor recommended that I go on disability but I didn't want to stop working." Id. 37-38. While working at MetLife, Plaintiff testified, "I was in a back office, in [the] broker dealer officer." Id. at 38. He described his position as processing claims, which he admitted was "sedentary work." Id. Plaintiff worked at MetLife for approximately four years. Id. at 38. Before MetLife, Plaintiff testified that he worked at Prudential for approximately eight years. Id. at 39. At Prudential, Plaintiff stated that he was employed in the mailroom, and he also "was the [switchboard] operator for the whole company, you know, for the building." Id. At the hearing, the ALJ questioned Plaintiff, "So if you had a job similar to your old job… could you do that kind of job?" Plaintiff responded, "To tell you the truth I doubt it unless it was just part time because like now my back is – my back feels like I have a knife stuck in it." Id. at 53.[6]

In that connection, Plaintiff testified that he is disabled because he suffers from numerous physical and mental impairments. See A.R. 34-59. Plaintiff testified that he suffers from a bad lower back. Id. at 40. Specifically, Plaintiff stated that he has "two herniated discs that are leaking and they'd already did nerve damage." Id. at 41. Plaintiff described his back pain as "outrageous." Id. at 42. According to Plaintiff, he "can't sit for a very long time, like a two hour period or hour and a half period." Id. at 41. To relieve the pain, he must walk around. Id. at 41.

---

[6] Nonetheless, Plaintiff also testified, "Basically I've been applying for an office position… I've been applying ever since January, '09, and basically like I said it's all office, you know, any kind of office position." A.R. 57.

With that said, Plaintiff testified that he "can't walk or stand for like more than 20 minutes" because his left "leg starts to, you know, burn." Id. at 41. In addition, Plaintiff testified, "Well, I have problems with bending. I can't bend over and lift anything up. Kneeling, my – I can't – I mean I can kneel but not for a long period. My, you know, knees hurt. And then trying to get up, forget it." Id. at 53. He was prescribed Percocet for the pain, but he often does not take the medication because he would "be in la-la land if I did." Id. at 53. Plaintiff testified that Dr. McKenna, his treating physician, recommended surgery. Id. at 53. He further testified that Dr. Ahmed, his orthopedic surgeon, did not recommend surgery.[7] Id. at 54.

Plaintiff also suffers from breathing problems. See id. at 34-59. Plaintiff testified that he uses a Continuous Positive Airway Pressure ("CPAP") machine because he suffers from sleep apnea. Id. at 47. Plaintiff also stated that he has suffered from asthma for three decades, so he uses Singulair, a Nebulizer, and two different inhalers to treat his symptoms. Id. at 42-43. In addition, Plaintiff testified that he was diagnosed with COPD, which he treats with Dulera, an inhaler. Id. at 42-43. Despite the treatment, Plaintiff explained, "I mean I've been really having difficult time breathing." Id. at 56. He further explained, "I don't even cut the grass anymore, I don't do any yard work, nothing at all because I can't breath. I can't – you know, between the back hurting and the breathing I can't do it." Id. at 58.

---

[7]     Plaintiff testified, "He [Dr. Ahmed] has my X-rays, you know, my last MRI and everything. I called his office for a report and he – the only thing he told me in the office, he says don't go – don't have an operation, don't see a chiropractor and don't go for no therapy." A.R. 54. He then stated, "I mean he didn't really examine me." Id.

Plaintiff also suffers from numerous other impairments. <u>See</u> <u>id.</u> at 34-59. Plaintiff testified that he underwent a cubital tunnel operation on his left hand, and now he experiences numbness in two of his fingers. <u>Id.</u> at 51. He stated, "Now the whole thing is when I'm typing, if I'm typing for any period of time they [the fingers] – I can't feel these two fingers on the keyboard."[8] <u>Id.</u> at 51. Plaintiff also testified that he suffers from adhesions, which are a result of a previous surgery to treat diverticulitis. <u>Id.</u> at 43. Plaintiff stated that he experiences "severe stomach ache[s] from the adhesions" on a daily basis. <u>Id.</u> at 43-44. To treat the adhesions, Plaintiff is prescribed Nexium, which helps to calm his stomach. <u>Id.</u> at 44. Plaintiff further testified that he suffers from glaucoma in his right eye. <u>Id.</u> at 50-51. In regard to mental impairments, Plaintiff testified that he suffers from "depression and stress," and he has contemplated committing suicide. <u>Id.</u> at 45-46. However, Plaintiff testified that he does not receive treatment from a psychiatrist or psychologist. <u>Id.</u> at 47. Rather, Dr. McKenna "just put me on the medication for depression." <u>Id.</u> at 45. Plaintiff explained that he is prescribed Zoloft and Trazadone. <u>Id.</u>

Finally, the ALJ asked, "Tell me what a typical day is like for you, what [do] you do?" <u>Id.</u> at 47. In general, Plaintiff testified that he "makes a cup – a pot of coffee and I'm on the Internet, either basically looking for jobs or else I'm on reading, you know, just articles and stuff like that, or else I'm playing games". <u>Id.</u> at 47-48. Plaintiff testified that he has a driver license, and sometimes he goes to the store to shop for food and personal

---

[8]    The ALJ later asked, "But you do work on the computer during the day?" A.R. 52. Somewhat inconsistently, Plaintiff testified, "Not very much. I very rarely – I mean." <u>Id.</u> He then testified, "Well, I play games – but that's with the mouse." <u>Id.</u> He also stated, "And the other thing for – is if I do go on it, it's just, you know, basically job searching and you know, I'd have to send my resume in, or I need [to] put in a little information in, whatever I have to do." <u>Id.</u>

care items. Id. at 40, 48-50. He also does light chores around the house, such as cleaning and laundry. Id. at 48-49. While he doesn't eat breakfast or lunch, he does eat dinner. Id. at 48. Plaintiff testified that he makes or orders dinner for himself and his mother. Id. at 48. He explained, "[I]t's something quick or a sandwich or like I said basically we order out quite a bit." Id. at 48.

## ALJ FINDINGS

The ALJ began by finding that Plaintiff met the insured status requirements of the Social Security Act to remain insured through December 31, 2014. A.R. 22. The ALJ then applied the standard five-step process to determine if Plaintiff had satisfied his burden of establishing disability. Id. at 20-27. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2009, the alleged onset date. Id. at 22. Second, the ALJ found that Plaintiff had the following severe impairments: lower back injury, obesity, asthma, and depression. Id. The ALJ noted, "Although the [Plaintiff] alleges depression and it is severe, I do not find that this impairment imposes any vocational limitations on the [Plaintiff]. The records do not show any treatment from mental health professional. He takes medication… with no apparent side effects. Moreover, he has had no hospitalizations." Id. In addition, the ALJ reasoned that Plaintiff's diverticulitis, hypertension, high cholesterol, and sleep apnea are not severe because those impairments are well-controlled with medication.

Third, the ALJ found that Plaintiff does not have an impairment, or a combination of impairments, that meets or medically equals the severity of one of the listed impairments under the SSA that would qualify for disability benefits. Id. at 23. Fourth, the ALJ found that Plaintiff had the residual functional capacity to perform the full range of sedentary

work under the SSA. Id. The ALJ determined that Plaintiff could "occasionally lift ten pounds, sit for approximately six hours, stand or walk for approximately two hours in an eight hour day with normal breaks." Id. The also ALJ determined that Plaintiff could occasionally climb ramps or stairs and balance, he could not climb a ladder, rope, or scaffold, and he could never stoop, kneel, crouch, or crawl. Id. Finally, the ALJ determined that he must "avoid concentrated exposure to extreme heat and cold, wetness, humidity, fumes, odors dusts, gases and poor ventilation." Id.

In the ALJ's residual functional capacity determination, she briefly described Plaintiff's background information, and then she concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effect of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Id. at 24. In regard to Plaintiff's severe lower back injury, the ALJ generally discussed the medical records from Plaintiff's treating doctors, Dr. Zimmerman, Dr. Del Valle, and Dr. Iqbal Ahmad. Id. 24-25. The ALJ also generally discussed the medical records from a consultative examination performed by Dr. Merlin. Id. at 25. Furthermore, the ALJ referenced the results from the June 17, 2010 MRI of Plaintiff's lumbar spine. Id. The ALJ reasoned that "although [Plaintiff] has a history of back pain, an MRI performed on May 26, 2006, showed little change when compared to a later study." Id. The ALJ further reasoned that Plaintiff has suffered from back pain since at least 2001, but he "was still working until 2008." Id.

The ALJ then discussed Plaintiff's daily activities, for example, "[h]e food shops alone, drives a car, makes dinner or goes to pick up dinner. He takes care of his mother and his dog." Id. In addition, the ALJ highlighted Plaintiff's testimony that he helps his mother,

13

watches television, and plays on the computer. Id. Briefly, the ALJ mentioned Plaintiff's diagnosis of COPD, and she also mentioned Plaintiff's testimony that he has difficulties using the last two fingers on his non-dominant hand. Id. Subsequently, the ALJ discussed the fact that Dr. McKenna recommended back surgery and prescribed pain medication, but "he does not want to do it because he is afraid." Id. 25-26. Also, the ALJ noted that Plaintiff "testified that he is supposed to take his pain medication for his back every four hours, but that he does not take it because it makes him feel unclear headed." Id.

Finally, the ALJ stated, in pertinent part, that "[b]ased on the entire record, including the testimony of the [Plaintiff], I conclude that the evidence fails to support the [Plaintiff's] assertions of total disability. Id. at 26. She further stated, "Despite the evidence demonstrating that the [Plaintiff] has suffered from a medically determinable 'severe' impairment, the evidence also establishes that the [Plaintiff] retains the capacity to function adequately to perform many basic activities associated with work." Id. The ALJ concluded, "I note that the [Plaintiff's] asthma limitations in the residual functional capacity do not significantly erode the occupational sedentary [work]." Id..

Fifth, the ALJ found that Plaintiff "is capable of performing past relevant work as a claimed processor and/or switchboard operator." Id. at 26. Accordingly, the ALJ concluded that Plaintiff was not under a disability under the SSA from January 1, 2009 through January 25, 2012, the date of the decision. Id.

**STANDARD OF REVIEW**

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the

Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); see Matthews v. Apfel, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); see Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. See Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir. 1986).

## STANDARD FOR ENTITLEMENT TO BENEFITS

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. See 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

15

12 months. . . ." 42 U.S.C. § 423(d)(1)(A); see Plummer, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. Id. § 1382c (a)(3)(A)–(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. See 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." Id. § 404.1520(a); see Bowen v. Yuckert, 482 U.S. 137, 146–47 n. 5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. See 20 C.F.R. § 404.1520(b); see also Bowen, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); see Bowen, 482 U.S. at 146–47 n. 5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." Id. A claimant who does not have a severe impairment is not considered disabled. Id. § 404.1520(c); see Plummer, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates

16

that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. See id. § 404.1520(d); see also Bowen, 482 U.S. at 146–47 n. 5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. See 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. Id. An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. Williams, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); Bowen, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); Bowen, 482 U.S. at 141–42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. Plummer, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." Bowen, 482 U.S. at 146–47 n. 5; Plummer, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's

impairments in determining whether the claimant is capable of performing work and not disabled. Id.

**PLAINTIFF'S CLAIMS ON APPEAL**

**1. Failure to Properly Evaluate the Objective Evidence[9]**

**A. Step Two Argument**

At Step Two, Plaintiff contends that the ALJ failed to properly evaluate, *inter alia*, Plaintiff's "herniated and bulging lumbar discs with lumbar radicular symptoms, asthma, COPD and other pulmonary impairments, left ulnar mononeuropathy, left cubital tunnel syndrome, myofascial pain syndrome and depression," which "imposed more than a minimal limitation on the Plaintiff's ability to do basic work activities." Pl.'s Br. at 12, 14-15. Defendant counters that the ALJ properly considered all objective evidence. Def.'s Br. at 13.

Plaintiff has the initial burden of demonstrating that he has a severe impairment. Bowen, 482 U.S. at 146; 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). A severe impairment must "limit significantly the claimant's ability to perform most jobs." Bowen, 482 U.S. at 146; see also 20 C.F.R. § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities").

---

[9]     In Plaintiff's brief, he isolates his argument to Steps Two and Four, and thus, this Court will not address Step Three.

"The step-two inquiry is a de minimis screening device to dispose of groundless claims." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003). "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality or a combination of slight abnormalities which have 'no more than a minimal effect on an individual's ability to work.' " Id. (citing S.S.R. 85-28). However, a determination that a claimant's request should be denied at Step Two "should be reviewed with close scrutiny." McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004).

In the instant matter, the ALJ found that Plaintiff suffered from the severe impairments of lower back injury, obesity, asthma, and depression.[10] A.R. 22. The ALJ, however, did not address other impairments, for example, COPD, left ulnar mononeuropathy, and left cubital tunnel syndrome. Nonetheless, after reviewing the Administrative Record, I find that the ALJ's failure to address these impairments does not require a remand or reversal because the evidence establishes that those impairments had a minimal effect on Plaintiff's ability to work. See Newell, 347 F.3d at 546.

First, the Administrative Record contains little objective and subjective medical evidence pertaining to COPD. On March 22, 2011, Plaintiff was diagnosed with COPD. Id. at 260. Over the span of several months, Plaintiff visited Dr. Sinha to remedy his troubled breathing. See id. at 307-310. On February 20, 2012, Dr. Sinha examined Plaintiff, and he recommended a smoking cessation education program. Id. at 307. At a follow up visit, Dr. Sinha reported that "[Plaintiff] has cut down smoking to 6-10 cigarettes/day, wheezing has resolved and overall he feels better, but still complains of dyspnea on

---

[10]   This Court will not address the aforementioned severe impairments at this stage of the analysis.

exertion." Id. at 308. On April 30, 2012, Dr. Sinha noted that Plaintiff is breathing better, and he does not suffer from coughing or wheezing. Id. at 310. At the hearing, Plaintiff testified that he was diagnosed with COPD, which he treats with Dulera, an inhaler. Id. at 42-43. Despite the treatment, Plaintiff explained, "I mean I've been really having difficult time breathing." Id. at 56. In total, the ALJ's finding that Plaintiff's COPD was not a severe impairment is sufficiently supported by the medical evidence.

Second, the Administrative Record contains objective and subjective medical evidence that Plaintiff suffers from a left ulnar mononeuropathy and left cubital tunnel syndrome, which means that he experiences numbness in two of his fingers. See A.R. 173-174, 176-182. Through an electrodiagnostic test, Dr. Lupicki confirmed that Plaintiff suffered from a left ulnar mononeuropathy, and Dr. Lupicki recommended several non-surgical treatment options. Id. at 173-174. Relatedly, Dr. Zimmerman determined that Plaintiff suffered form left cubital tunnel syndrome. Id. at 176- 182. After several ineffective treatments, Dr. Zimmerman performed corrective surgery on Plaintiff, which significantly improved Plaintiff's range of motion and grip and pinch strength. See id. At the hearing, Plaintiff testified that he still experiences numbness in his fingers, but he is able to accomplish personal and household chores, and he is able to work and play on the Internet. See id. at 34-59. Again, the ALJ's finding that Plaintiff's left ulnar mononeuropathy and left cubital tunnel syndrome were not severe impairments is sufficiently supported by the medical evidence.

## B. Step Four Argument

At Step Four, Plaintiff argues that the residual functional capacity assessment is incomplete because the ALJ did not properly evaluate all of the Step Two severe

20

impairments, including the lower back injury, obesity, asthma, and depression. Pl.'s Br. at 12, 18; see A.R. 22. In addition, Plaintiff also contends that the ALJ did not properly evaluate Plaintiff's other objective physical and mental limitations. Id. at 18-19. In response, Defendant maintains that the ALJ properly evaluated Plaintiff's severe and other physical and mental limitations. Def.'s Br. at 13-15.

At Step Four, the claimant must prove whether he or she retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); Bowen, 482 U.S. at 141. "In making a residual functional capacity determination, the ALJ must consider all evidence before him [or her]." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000). The ALJ may weigh the credibility of the evidence, but he or she "must give some indication of the evidence which he [or she] rejects and his [or her] reason(s) for discounting such evidence." Id. Stated differently, "[T]he ALJ's finding of residual functional capacity must 'be accompanied by a clear and satisfactory explication of the basis on which it rests.' " Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001) (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)).

In the instant matter, the ALJ wrote, "Based on the entire record, including the testimony of the [Plaintiff], I conclude that the evidence fails to support the [Plaintiff's] assertions of total disability." A.R. at 26. She further concluded, "Despite the evidence demonstrating that the [Plaintiff] has suffered from a medically determinable 'severe' impairment, the evidence also establishes that the [Plaintiff] retains the capacity to function adequately to perform many basic activities associated with work." Id. Despite these conclusory statements, this Court finds that the ALJ erred because she did not consider all

of the evidence, and she did not provide a sufficient indication of the evidence that she rejected or the reasons for discounting some evidence. See Burnett, 220 F.3d at 121.

The ALJ directly addressed the Plaintiff's lower back pain. A.R. 24-25. The ALJ concluded that Plaintiff has the residual functional capacity to perform the full range of sedentary work with some limitations. Id. In support of the conclusion, the ALJ reasoned, "I note that although the [Plaintiff] has a history of back pain, an MRI performed on May 26, 2006, showed little change when compared to a later study. Moreover, it appears that the [Plaintiff] had this condition since at least 2001." Id. at 25.

The ALJ cited several reports from Plaintiff's treating doctors, including Dr. Del Valle and Dr. Iqbal Ahmad. Id. at 25. In addition, the ALJ cited a 2010 MRI report, which states that Plaintiff has "[n]o significant change or new herniations was identified when compared to a prior May 2006 MRI." Id. The ALJ also cited the report of Dr. Merlin, an agency consultative doctor, which stated that Plaintiff "was able to flex the spine forward to 75 degrees, squat, and walk on his heels and toes." Id.

In the residual functional capacity determination, however, the ALJ did not make any reference to Dr. McKenna's opinion that Plaintiff was completely disabled because of his lower back injury. See A.R. 265. While Dr. McKenna provided limited medical records, because Dr. McKenna has been Plaintiff's longtime primary care doctor and possesses intimate knowledge of Plaintiff's medical impairments, the ALJ's failure to even consider Dr. McKenna's opinion in her finding, which may have contradicted with other objective medical evidence, is error. See Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (reasoning that if a treating physician's opinion conflicts with that of a non-treating

physician, "the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reasons").

Moreover, the ALJ barely discussed the severe impairments of obesity, asthma, and depression. In regard to obesity, the ALJ mentioned Plaintiff's height and weight, and she cited a report by Dr. Merlin, which stated that Plaintiff is obese. A.R. 25. Besides those two instances, the ALJ's residual functional capacity determination is silent on obesity. In regard to asthma, the ALJ acknowledges that Plaintiff "also has progressive asthma," which causes "pain and limitations." A.R. 24-25. The ALJ concluded, "I note that [Plaintiff's] asthma limitations in the residual functional capacity do not significantly erode the occupational base for sedentary." Id. at 26. However, the ALJ's determination does not provide background information, and it does not provide an explanation for this conclusion. Finally, the ALJ stated that Plaintiff suffers from depression.[11]  Id. at 24, 25. Once again, the ALJ's determination is silent

Therefore, the ALJ did not expressly consider all of the evidence pertaining to Plaintiff's Step Two severe impairments. Pearson v. Barnhart, 380 F. Supp. 2d 496, 506 (D.N.J. 2005) (reasoning that the requirement to specify the relied upon evidence "is not satisfied by the ALJ's mere assertion that the residual functional capacity was based on medical evidence"). In that connection, the ALJ may have weighed the credibility of the objective medical evidence, but she did not explicitly indicate the evidence she rejected and the reasons why she rejected it. With regard to Dr. McKenna's medical opinion, the

---

[11]      At Step Two, the ALJ concluded that Plaintiff's depression does not impose any vocational limitations. A.R. 22. The ALJ reasoned that, based on the record, Plaintiff has not received any treatment from a mental health professional, and "he has had no hospitalizations." Id. In that connection, Dr. McKenna prescribed Plaintiff medication with "no apparent side effects." Id.

ALJ provides no reasoning for why the opinion was not considered. Courts have remanded ALJ decisions where an ALJ has not specified how much weight to give a treating physician's opinion; here, the ALJ does not even mention Dr. McKenna's opinion, let alone provide reasoning for how much weight she accorded the opinion. See Gonzalez v. Astrue, 537 F. Supp. 2d 644, 660 (D. Del. 2008) ("Even where there is contradictory medical evidence . . . and an ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must still carefully evaluate how much weight to give the treating physician's opinion.").

Accordingly, the ALJ's residual functional capacity determination does not provide this Court with a clear and satisfactory explication of its reasoning and will be remanded on this point. See Fargnoli, 247 F.3d at 41.

**2. Failure to Properly Evaluate the Subjective Evidence**

At Step Four, Plaintiff argues that the ALJ failed to properly evaluate the subjective medical evidence "of low back pain shooting down the left leg, left hand weakness and pain, side effects of medication including dizziness and drowsiness, and loss of attention and concentration, daily abdominal pain and discomfort occurring at unpredictable times from adhesions and shortness of breath on even limited exertion." Pl.'s Br. at 17. Defendant counters that the Administrative Record supports the ALJ's determination. Def.'s Br. 16-18.

In evaluating symptoms, the ALJ must consider "all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a); see Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) ("Allegations of pain and other subjective

24

symptoms must be supported by objective medical evidence."). However, "the ALJ must still explain why he [or she] is rejecting the testimony." Burnett, 220 F.3d at 122. In that connection, after the ALJ finds a medical impairment that could cause the symptoms, such as severe impairments, "he or she must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." Hartranft, 181 F.3d at 361. Thus, the ALJ must "determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." Id.

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." A.R. 24. As previously mentioned, the ALJ determined that Plaintiff suffered from several severe impairments, and the Administrative Record is replete with Plaintiff's testimony that he suffers from significant pain. However, the ALJ suggests that Plaintiff exaggerated the intensity and persistence of his pain. The ALJ reasoned that "although he testified about difficulties using the last two fingers in his non-dominant left hand, [Plaintiff] testified that he uses the computer ever day. He uses a roller ball mouse." A.R. 25. The ALJ also noted Plaintiff's testimony that "watches television, goes on the computer daily to search for jobs on the Internet, plays games or chats with friends." Id. at 25. Finally, the ALJ noted that Plaintiff testified that he "food shops alone, drives a car, makes dinner or goes to pick up dinner. He takes care of his mother and his dog. He has no problem with personal care. He need to get up from sitting every hour and walk around." Id. Further, she

25

took Plaintiff's subjective complaints about his back pain into account by finding that Plaintiff could lift no more than ten pounds occasionally. Id. at 26.

The ALJ's residual functional capacity determination shows that though the ALJ did not explicitly reject Plaintiff's subjective complaints, she considered them and discounted those that conflicted with Plaintiff's testimony elsewhere about his abilities as well as the medical evidence. See Brown v. Astrue, 789 F. Supp. 2d 470, 485 (D. Del. 2011) (finding no error where "[t]he language of the opinion shows that the ALJ in this case considered plaintiff's subjective complaints as relayed in her medical records and rejected those complaints that were inconsistent with plaintiff's testimony regarding her functional abilities."). Therefore, no remand is warranted for failure to evaluate the subjective evidence.

**3. Past Relevant Work**

Finally, Plaintiff contends that the ALJ erred in evaluating Plaintiff's past relevant work. In assessing a claimant's past relevant work,

> (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

Garibay v. Comm'r of Soc. Sec., 336 F. App'x 152, 158 (3d Cir. 2009) (quoting Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 120 (3d Cir. 2000)). According to the Social Security Administration,

> The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level, exertional demands and nonexertional demands of such work. Determination of the claimant's ability to do [past relevant work] requires a careful appraisal of (1) the individual's statements as to

which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the Dictionary of Occupational Titles, etc., on the requirements of the work as generally performed in the economy.

Titles II & XVI: A Disability Claimant's Capacity to Do Past Relevant Work, in Gen., SSR 82-62 (S.S.A. 1982); see also Burnett, 220 F.3d at 120; Garibay, 336 F. App'x at 158. In evaluating this evidence, the ALJ should find whether "the claimant retains the capacity to perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it" or whether "the claimant retains the capacity to perform the functional demands and job duties of the job as ordinarily required by employers throughout the national economy." S.S.R. 82–61. The ALJ may rely on job descriptions found in the Dictionary of Occupational Titles ("DOT") to assist in determining the ordinary job requirements of the occupations in question. Id. "If the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be 'not disabled.'" Garibay, 336 F. App'x at 158 (citing S.S.R. 82-61).

Plaintiff initially argues that the ALJ erred in finding his job as a switchboard operator as "past relevant work" at Step Four, because Plaintiff held that job between 1994 and 1996 and "past relevant work" is work that was done in the last fifteen years. 20 C.F.R. § 404.1565(a). In support of his argument, Plaintiff points to the fact that the ALJ reached her decision in 2012, sixteen years after he last worked as a switchboard operator.  Pl.'s Br. at 21. Plaintiff apparently bases his argument that Plaintiff's switchboard operator work

began in 1994 on Plaintiff's Work History report, in which Plaintiff listed his "In House Opp / Shipping" position for an insurance company as worked between 1994 and 1996. *See* A.R. 123.

Defendant, however, disputes Plaintiff's claim that he held his switchboard operator position from 1994 to 1996, pointing to Plaintiff's testimony that "he held the position of switchboard operator when he first started at Prudential Insurance Company" and relying on Plaintiff's earning records, which state that he began working for Prudential in 1997. Def.'s Br. at 18. Therefore, Defendant argues, "any work Plaintiff performed at Prudential, including the position of switchboard operator, was within the 15 years prior to the ALJ's decision and therefore met the recency requirement of past relevant work." Id.

In his reply, Plaintiff admits that there are discrepancies between Plaintiff's written statements, earning records, and testimony at the ALJ hearing[12] but argues that the ALJ did not properly question Plaintiff so as to develop the record regarding Plaintiff's work history and repeatedly interrupted Plaintiff when he attempted to describe the jobs he held. Therefore, Plaintiff argues, "[t]he ALJ's failure to develop the record as to [Plaintiff's] past relevant work and to resolve these discrepancies prior to proceeding to Step 4 requires reversal and remand . . . ." Pl.'s Reply Br. at 4.

---

[12]   For example, Plaintiff points to his testimony that before 1997, he "worked for Prudential healthcare" in the mail room and as a switchboard operator, which, according to Plaintiff, was a composite job because a mail clerk and a switchboard operator have two different DOT codes.  Plaintiff further points to his earning records, which show that he worked at Prudential from 1996-2003 and his Disability Report and Work History Report, where he wrote that he worked as a Transfer of Assets Representative for an insurance company from 1996 to 2004.

However, there does not appear to be any dispute between the parties about the fact that Plaintiff held his first position at Prudential less than fifteen years prior to the ALJ's decision. In an affidavit attached to his reply brief, Plaintiff concedes that he worked at Prudential "in a combined job of In-House Operations and Shipping . . . for a little over two years starting in 1996." Standowski Aff. at ¶ 1.  Plaintiff's earnings statements, included in the record, reflect this fact; his earnings from Prudential began in 1996. A.R. 102. Also, in a separate form regarding Plaintiff's Work Background that Plaintiff submitted, Plaintiff lists the specific months he worked for Prudential—from March 1996 to August 2003.[13] A.R. 155. Further, it is clear that the ALJ based his conclusions regarding the timing of Plaintiff's prior work at least in part on Plaintiff's earnings records. *See* A.R. 39 ("Q: And how long were you at Prudential? A: I think it was seven and a half years, or eight years. Q: Okay. I see some earnings beginning in '97 . . . .").[14] The ALJ's findings regarding the recency of Plaintiff's employment therefore appear to be based on substantial evidence. Even if the ALJ's findings on this point were not based on substantial evidence, her findings do not merit remand because they did not result in prejudice and are thus, at most, harmless error. Rosa v. Colvin, 956 F. Supp. 2d 617, 624-25 (E.D. Pa. 2013) ("Under

---

[13] The Court acknowledges that Plaintiff's submissions into the record regarding his work history are inconsistent. In his Work Background form, Plaintiff only states that he worked in Prudential's Transfer of Assets department, whereas in his Work History form, he notes that his first position at an "insurance company" in 1996 was in the In-House Shipping / Operations area. *Compare* A.R. 123 *with* A.R. 155.

[14] The Court further acknowledges that Plaintiff's work for Prudential began in 1996, not in 1997. However, as discussed *supra*, even if the ALJ believed Plaintiff began working for Prudential as a switchboard operator in 1997, not in 1996, such an error would be harmless because either way, Plaintiff's work at Prudential would meet the recency requirement for past relevant work.  *See* 20 C.F.R. § 404.1565(a).

the harmless error rule, an error only warrants remand if it prejudiced a party's 'substantial rights.'") (citing <u>Shinseki v. Sanders</u>, 556 U.S. 396, 407 (2009)).

Next, Plaintiff disputes the ALJ's conclusion that Plaintiff ever worked as a "claims processor and/or switchboard operator." A.R. 26. Plaintiff claims he never worked exclusively as a switchboard operator and never held the position of a claims processor.[15] Pl.'s Reply Br. at 3. Rather, Plaintiff claims he worked a "composite job" as Switchboard Operator and Mailer until about 1997, where he "was required to do sitting, standing, and lifting and carrying" up to fifty pounds, and his job description did not match the DOT definition of Switchboard Operator. <u>See</u> <u>Titles II & XVI: Past Relevant Work-the Particular Job or the Occupation as Generally Performed</u>, SSR 82-61 (S.S.A. 1982) ("Composite jobs have significant elements of two or more occupations and, as such, have no counterpart in the DOT. Such situations will be evaluated according to the particular facts of each individual case."). Further, Plaintiff argues that while a portion of his job duties as a Senior Broker/Dealer Specialist and Transfer of Assets Representative at Prudential and, later, MetLife, involved processing insurance/broker claims, "his job duties were actually more complex and involved additional duties" that were best matched by the unique DOT codes of Brokerage Clerk I, or Brokerage Clerk II." Pl.'s Br. at 21; Pl.'s Reply Br. at 3. Plaintiff points to his written statements on the record in support of his job descriptions.[16] *See* A.R. 123–127.

---

[15] Plaintiff raises this argument for the first time in his reply brief. Generally, a court does not consider arguments raised for the first time in a reply brief, because the opposing party does not have an opportunity to respond to the argument. E.g., <u>National RR Passenger Corp. v. Pennsylvania Pub. Utility Comm'n</u>, 342 F.3d 242 (3d Cir. 2003). However, the Court will consider Plaintiff's argument here out of an abundance of caution.

[16] Plaintiff claims he "was cut off by the ALJ every time he tried to explain his job duties at [the] hearing," presumably in explanation for why a full explanation of his job

Defendant, in support of its position that Plaintiff engaged in past relevant work as a claims processor,[17] points out that Plaintiff testified at his hearing that his position at MetLife consisted of "processing of claims and basically that was it."[18] A.R. 38. Further, Defendant cites to S.S.R. 82-62 for the propositions that (1) "[t]he claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level, exertional demands and nonexertional demands of such work" and (2) only "in some cases" is a careful appraisal of "supplementary or corroborative information from other sources such as employers, the Dictionary of Occupational Titles, etc., on the requirements of the work as generally performed in the economy" required to determine the nature of past work. S.S.R. 82-62.

The Court finds that the ALJ's finding that Plaintiff engaged in past relevant work as a switchboard operator does not appear to be based on substantial evidence. Plaintiff

---

descriptions does not appear in the hearing transcripts. Pl.'s Br. at 4. Further, Plaintiff points out that the ALJ failed to employ a vocational expert to analyze Plaintiff's past work and how it relates to his residual functional capacity.

[17] Plaintiff only raises the argument that his first job at Prudential was a composite job and not as a switchboard operator in his reply brief. *See generally* Pl.'s Br, Pl.'s Reply Br.

[18] However, the Court notes that Plaintiff's full response to the question of what he did at MetLife was as follows:

> Q:  . . . . And what did you do for MetLife?
> A: It's processing of claims and basically that was it, but you know -- and --
> Q: Sedentary work, that you worked at a desk –
> A: Basically --
> Q: -- with a computer?
> A: -- desk work, yeah.
> Q: Okay . . .

A.R. 38.

himself testified that his first job at Prudential had two components: as he states, "the first part of it was in the mail room and, you know, that type of work and [second,] I was the operator for a while company, you know, for the whole building, switchboard operator." A.R. 39. The dual nature of Plaintiff's job qualifies as a composite job within the meaning of the Social Security Administration's definition. *See* S.S.R. 82-62. Further, Plaintiff's Work History report notes that his composite job was not sedentary—Plaintiff states in his report that he stood for six hours a day, lifted objects as heavy as 50 pounds, and part of his duties involved lifting and carrying health care books for shipment. *See* A.R. 126. "The Commissioner's determination regarding a claimant's ability to perform past relevant work will be clear error where it is contrary to evidence presented by the claimant or where it is not supported by substantial evidence." Galvin v. Comm'r of Soc. Sec., Civ. No. 08-1317, 2009 WL 2177216, at *11 (W.D. Pa. July 22, 2009) (citing Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981)).

However, the ALJ's finding that Plaintiff engaged in past relevant work as a claims processor does appear to be based in substantial evidence. Plaintiff's descriptions of his work both as a Transfer of Assets Representative and as a Senior Broker Dealer Specialist state that he largely processed mutual fund applications, incoming checks, change of representative information, etc. and updated account information. *See* A.R. 124–25. And Plaintiff testified that his work at MetLife essentially involved claims processing. A.R. 38. There is no conflicting evidence in the record showing that Plaintiff's work as either a Transfer of Assets Representative or as a Senior Broker Dealer Specialist involved anything more complex than the sedentary, clerical work associated with claims

processing.[19] While the ALJ did not use a vocational expert or cite the DOT definitions,

the Court finds that Plaintiff's statements regarding his past work, all of which were

_____

[19] Plaintiff argues that his Senior Broker Dealer Specialist job should be classified under the DOT definition of Senior Broker for an Insurance Company, a sedentary and skilled occupation, or Brokerage Clerk II, a sedentary and semiskilled occupation, and his Transfer of Assets Representative job should be classified under the DOT definition of Brokerage Clerk I, a sedentary and semiskilled occupation. Pl.'s Br. at 21–22. The DOT definition of a brokerage clerk is as follows:

> Records purchase and sale of securities, such as stocks and bonds, for investment firm: Computes federal and state transfer taxes and commissions, using calculator and rate tables. Verifies information, such as owners' names, transaction dates, and distribution instructions, on securities certificates to ensure accuracy and conformance with government regulations. Posts transaction data to accounting ledgers and certificate records. Types data on confirmation form to effect transfer of securities purchased and sold. Receives securities and cash and schedules delivery of customer securities.

Brokerage Clerk I (financial), DICTIONARY OF OCCUPATIONAL TITLES http://www.occupationalinfo.org/21/219482010.html (last accessed Jan. 29, 2015). The DOT definition of a broker is,

> Sells financial products and services to clients for investment purposes, applying knowledge of securities, investment plans, market conditions, regulations, and financial situation of clients: Identifies potential clients, using advertising campaigns, mailing lists, and personal contacts. Solicits business from potential clients. Interviews clients to determine financial position, resources, assets available to invest, and financial goals. Provides clients with information and advice on purchase or sale of securities, financial services, and investment plans, based on review of professional publications and other financial literature, and knowledge of securities market and financial services industry. Completes sales order tickets and submits completed tickets to support personnel for processing of client requested transaction. Must pass state examination to receive license and become registered to sell securities. May read status reports and perform calculations to monitor client accounts and verify transactions. May work for firm that offers discounted brokerage fees and does not offer advice to clients. May develop and implement financial plans, and sell insurance, real estate, or securities.

Registered Representative (financial) alternate titles: account executive, broker, DICTIONARY OF OCCUPATIONAL TITLES, HTTP://WWW.OCCUPATIONALINFO.ORG/25/

consistent and supported the ALJ's finding, were sufficient for the ALJ's determination that Plaintiff engaged in past relevant work as a claims processor. See Lopez v. Comm'r of Soc. Sec., 270 F. App'x 119, 123 (3d Cir. 2008) ("At step four of the sequential evaluation process, the decision to use a vocational expert is at the discretion of the ALJ.") (citing 20 C.F.R. § 404.1560(b)(2)); *see also* S.S.R. 82-62 ("[I]n some cases, supplementary or corroborative information from other sources such as employers, the Dictionary of Occupational Titles, etc., on the requirements of the work as generally performed in the economy" should be carefully appraised.).

Even though the ALJ's finding that Plaintiff engaged in past work as a switchboard operator does not appear to be based in substantial evidence, the ALJ ultimately concluded that Plaintiff could go back to "past relevant work as a claims processor and/or switchboard operator." A.R. 26. Because the Court finds that the ALJ's conclusion that Plaintiff engaged in past work as a claims processor is correct, remand or reversal is not warranted on this point because the ALJ found that Plaintiff could seek work in either occupation. Thus, the ALJ's erroneous conclusion about Plaintiff's composite job is harmless error.

Therefore, the ALJ's findings regarding the nature of Plaintiff's past relevant work do not require remand or reversal.

**CONCLUSION**

---

250257018.html (last accessed Jan. 29, 2015). Both occupational descriptions describe duties going above and beyond the job duties in the record that Plaintiff provided about his prior work as a Senior Broker Dealer Specialist or as a Transfer of Assets Representative. Because even the duties described in the Brokerage Clerk I description are more complex than the descriptions Plaintiff provided about his own work, the Court will not analyze the job descriptions in the Brokerage Clerk II title.

For the reasons set forth above, this Court finds that it would be appropriate to remand this matter for further consideration and a more satisfactory explication of the objective evidence, specifically pertaining to Plaintiff's severe impairments, at the Step Four residual functional capacity determination.


Dated: January 29, 2015                                        /s/ Freda L. Wolfson

                                                   The Honorable Freda L. Wolfson
                                                   United States District Judge